Argued December 19, 1978; submitted in banc February 22,
affirmed as modified April 2; reconsideration denied May 8, 1979

In the Matter of the Marriage of
PATTERSON, nka Fox, *Respondent,*
*and*
PATTERSON, *Appellant.*
(No. 76-5088, CA 11611)
592 P2d 576

Robert B. Dugdale, Eugene, argued the cause for appellant. With him on the brief was E. B. Sahlstrom, Eugene.

Jack A. Billings, Eugene, argued the cause for respondent. With him on the brief was Diment, Jagger & Billings, Eugene.

SCHWAB, C. J.

**SCHWAB, C. J.**

The father appeals from a trial court order changing the custody of the parties' son, Richard, to the mother. Father contends the trial court committed a variety of procedural errors, that the evidence does not warrant a change of custody, and that the trial court erred in requiring the father to post a bond before he could visit his children. For reasons that follow, we find no reversible procedural error; we agree with the trial court's custody determination; and we modify the decree to eliminate the bond requirement.

■ Father was served with an order to show cause why custody of the parties' elder son should not be transferred to the mother. He claims service was defective because it gave him less than 20 days' notice of the hearing date. He did not raise this issue in the trial court until after completion of the hearing. Father's general appearance at the hearing waived any defects in service of the show-cause order.

Father's other procedural contention does not warrant discussion—other than to note that it was not raised in a timely manner in the trial court and that we find it impossible to conceive of any possibility of prejudice.

The facts developed on the custody issue are as follows: The original decree of dissolution, entered in June of 1977, provided that father was to have custody of Richard and mother was to have custody of a younger son, Michael. Shortly after the decree, father was discharged from the military. Over the following year he was unemployed most of the time. He quit his first job after three weeks. Father then attended Lane Community College for about five months. He then obtained employment with the Vernonia Police Department. One condition of that employment was that he attend a police academy. Father "dropped out" of the police academy a few days before he would have completed the two-month program there. Because he

[425]

had not completed the required program, Vernonia terminated his employment.

Father's abrupt departure from the police academy was for the purpose of marrying his present wife. They had met while both were students at Lane Community College. Father and Richard were then living with father's parents in Eugene. When father moved to Vernonia to begin attending the academy, Richard remained in Eugene with his grandmother, while father and his present wife began living together in Vernonia. Richard later joined his father and—at that time—"de facto" stepmother in Vernonia. Father's new wife has, as the trial court put it, "what charitably would be called a modest criminal record, some of it definitely in the area of cheat and fraud." All of her convictions predated her involvement with father and Richard, and at the hearing she stressed her community college study and employment in the area of child counseling and child psychology. The trial court did not accept her self-portrait:

> "* * * the present Mrs. Patterson's testimony was interlaced liberally with socialist cant and, very frankly, I was completely unimpressed with her testimony, and in light of her past record, I did not believe very much of it."[1]

Another credibility issue the trial court confronted concerned the claim that father had vilified mother in front of Richard. Mother's mother testified that, during two face-to-face conversations she had with father, with Richard present, father made derogatory remarks about mother. Father denied that these conversations ever took place. The trial court found:

> "I believe that [father] did, at least, on one occasion vilify the character of her, and that it was in the presence of the minor child Richard to his detriment."

The genesis of this litigation was visitation rights. As was apparently contemplated at the time of the

---

[1] In the context of his remarks we interpret the use of the word "socialist" to mean social work or something of that nature.

original dissolution decree, mother promptly remarried and resided with her new husband in Germany, where he was stationed in the armed forces. It thus apparently being contemplated that the mother and father would reside on different continents, the original decree provided that Richard, the son in father's custody, would visit mother one month a year and Michael, the son in mother's custody, would visit father one month a year; the decree, by incorporating the parties' agreement, provided detailed mechanics for the transportation of the children to and from visiting the noncustodial parent. Under the terms of the decree, Richard was to have his first visit with his mother in Germany during the month of July, 1978. In March of 1978 father wrote to mother that he was not going to permit Richard's scheduled July visit. Father's explanation at the custody hearing for his unilateral decision was that in March he was losing his Vernonia police job and getting married, that Richard thus needed time to adjust to all these changes, and that a July trip to another country would have been too potentially disruptive for Richard. Mother sought to have father held in contempt. After considerable procedural maneuvering by both parties, the proceedings evolved into the present question of whether Richard's custody should be changed to mother.

■ We conclude that circumstances have materially changed since the original dissolution decree: father's occupational instability; father's remarriage to a woman of questionable background; father's extremely intemperate references to his ex-wife in his son's presence; and father's cavalier attitude toward his visitation obligations under the decree. The evidence of occupational instability was uncontroverted. There was conflicting evidence on the other points, but we find no basis in the record for disagreeeing with the trial court's express or implied credibility findings.

Given changed circumstances, the question becomes: what custody arrangement is in the best

[427]

interests and welfare of the child? *Greisamer v. Greisamer*, 276 Or 397, 555 P2d 28 (1976). At this level, it has long been the law of Oregon that appellate courts tend to defer to trial courts. In *Rea v. Rea*, 195 Or 252, 261, 245 P2d 884, 35 ALR2d 612 (1952), the Supreme Court referred to the opportunity of trial courts to observe both the parents and child, and stated:

> "* * * This court is ill-equipped to exercise a wise and humane discretion on a record which, of necessity, fails to disclose the subtle, but highly persuasive, evidences which are manifest to the trial judge. A wise appraisal of the character, fitness, emotional stability, affection, hostility, or motive, of the [respective parents] * * * or a like appraisal of the inner attitude of the child itself, requires more than can generally be made to appear on the printed page."

In *Starin and Starin*, 29 Or App 557, 559, 564 P2d 748, *rev den* (1977), we also relied upon the opportunity of trial courts to observe the parties, and thereby make a "delicate appraisal of [the respective parents'] personality and character," and extended the degree of appropriate deference to the point of saying:

> "* * * We are reluctant to reweigh testimony of the nature presented here without some evidence that the trial court's observations were manifestly mistaken. * * *" 29 Or App at 560.

No clear mistake was made in this case. The most that can be said for leaving custody with the father is that there was evidence of both advantages and disadvantages. It is precisely in this kind of equipoise situation that the trial court's "delicate" (*Starin*) and "subtle"(*Rea*) assessment of the intangible qualities of the various family members is critical. We are as satisfied as it is possible to be from an appellate record that the trial court had ample opportunity to make such an assessment in this case and did so. We find no objective basis for concluding that changing Richard's custody to his mother was other than in his best interests.

■ Father also assigns as error that portion of the court's order allowing mother to require father to post a bond before father is entitled to visitation with his sons. Father contends, and we agree, that this provision is invalid for the same reasons that Oregon courts frown upon conditioning visitation upon making support payments; the result may be punishment of the child for an act of the parent, and that is to be avoided in all but exceptional circumstances. *See Bartlett v. Bartlett*, 175 Or 215, 152 P2d 402 (1944); *West v. West*, 6 Or App 128, 487 P2d 96 (1971); *cf., Hemstreet v. Hemstreet*, 228 Or 88, 363 P2d 731 (1961); *Crowell v. Crowell*, 184 Or 467, 198 P2d 992 (1948); *Dooley and Dooley*, 30 Or App 989, 569 P2d 627 (1977). Here, we are not persuaded the circumstances warrant such a harsh requirement at this time.[2]

Affirmed as modified. No costs to either party.

**THORNTON, J.,** concurring and dissenting.

While I concur with the majority's disposition of the procedural and visitation issues, I am in disagreement with the majority's determination that circumstances warranted a change of custody of Richard to the mother in Germany.

After reviewing this record, I conclude, first, that there was not a sufficient change of circumstances warranting the change of custody; and second, that a change of custody would be detrimental to Richard, and that he should be left where he now is, *i.e.*, with his father. This was borne out by the child psychologist who examined Richard. According to this witness, although Richard evinced a strong desire to be with his brother, he considers the psychologist testified that Richard's relationship with his father was most important to him and that with his brother less important.

---

[2] In the "Summary of Argument" section of his brief, father complains about the trial court's award of costs and attorney fees to mother. He does not, however, make any assignment of error on those issues. We therefore conclude those issues are not properly before us.

Tanzer, Joseph and Gillette, JJ., join in this concurring and dissenting opinion.